IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**JUSTIN JAMES HINZO,**

**Petitioner,**

**vs.**                                                               Civ. No. 06-0391 MV/WDS

**JOSE ROMERO, Warden, et al.,**

**Respondents**

## MAGISTRATE JUDGE'S PROPOSED
## FINDINGS AND RECOMMENDED DISPOSITION[1]

This is a Petition For a Writ of Habeas Corpus filed under 28 U.S.C. § 2254 by Justin James Hinzo. Hinzo is acting *pro se*. Respondent has filed an Answer and Motion to Dismiss in opposition to the Petition. Petitioner has filed a response in opposition to the Motion to Dismiss, a supplemental response, objections, an appendix consisting of Exhibit C, and additional evidence by way of motion. The Court has read and considered all of the pleadings and evidence submitted by Petitioner. The United States Magistrate Judge, having considered the arguments of the parties, the record, relevant law, and being otherwise fully advised, finds and recommends that the Motion to Dismiss be granted. The Court makes the following findings and recommended disposition.

### FACTUAL AND PROCEDURAL BACKGROUND

Early in the morning of November 23, 2002 the Petitioner was out driving with two friends, Alfred Silva and Lorenzo Ramos. The three men met up with Dean Montano, Luther Wheylan, Marie Lisa Montano and Rosario Mata in the parking area of a local trailer park. All of the

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

individuals had been drinking, some quite heavily. Mr. Silva, Mr. Ramos[2] and Mr. Montano knew each other, and had gotten out of their vehicles and were talking. Petitioner stayed in the car that he had driven to the trailer park, talking with one of the females present. Mr. Wheylan remained in the other car that had been driven to the scene.

After talking for a short period of time, Mr. Silva and Mr. Montano began to argue, then began to fight. There was conflicting testimony as to who was winning the fight, and as to who was the "third man in." Petitioner testified that he got out of the car and was standing, watching Mr. Silva and Mr. Montano fight when Mr. Wheylan got out of the car and hit him in the face with a beer can. Mr. Wheylan testified that he did not get out of the car until he saw Petitioner and Mr. Silva both fighting his friend. At that point he got out of the car and joined the fight. There is little question that someone, Mr. Wheylan or Mr. Montano, hit Petitioner hard in the left eye with either a fist or a beer can, as Petitioner ended up with a gash below his eye and significant swelling and discoloration.

At some point after he was hit in the eye, Petitioner pulled a pistol from the back of his pants and shot Mr. Montano twice, at close range, in the chest. Petitioner then turned and shot once at Mr. Wheylan, wounding him in the leg. Mr. Montano did not survive his wounds. Again, there was conflicting testimony regarding the circumstances of the shooting. Petitioner testified that he saw Mr. Wheylan and Mr. Montano standing over Mr. Silva, and that Mr. Montano had an object in his hand that appeared to be a knife or screwdriver. Petitioner testified that Mr. Montano turned towards him with the object and lunged towards him, as if to stab him. Petitioner testified that he fired two shots at Mr. Montano in self defense. Petitioner further testified that he fired a third time

---

[2]Mr. Ramos is blind, and although he was present for the fight, he did not testify at trial.

because at the time he saw Mr. Montano and Mr. Wheylan standing over Mr. Silva, he was being pummeled from behind by two or three unknown assailants. The third shot struck Mr. Wheylan in the leg.

In contrast to Petitioner's version of events, no other witness testified that anybody was fighting, or striking Petitioner, other than Mr. Wheylan or Mr. Montano. No other witness testified that Mr. Montano had a knife or similar object, and no such object was found at the scene. Mr. Wheylan testified that he only got involved in the fight after Petitioner started fighting, and that he had squared off with Mr. Silva some distance away from where Petitioner had squared off to fight with Mr. Montano. Mr. Wheylan testified that he heard two shots, tried to run away, and was shot once as he tried to get away.

After the shooting, Petitioner, Mr. Silva and Mr. Ramos drove off, returning to their respective residences. Petitioner was picked up by the police for questioning. While he was being driven to the station he told the officer that he had received his black eye in a fight the night before. Petitioner's girlfriend, Julie Perez, was questioned by the police, and also initially claimed that Petitioner had gotten his black eye the night before the shooting, although at trial she denied making that statement.

Petitioner initially told the police that he did not shoot Mr. Montano or Mr. Wheylan. However, he later changed his story and admitted that he had shot both men, allegedly in self defense. Petitioner told the police that he saw Mr. Montano holding something that looked like a knife, and that he appeared ready to stab Mr. Silva. Petitioner said that he pulled his gun and that when Mr. Montano saw the gun he advanced toward Petitioner, as though to stab him. Petitioner stated that he fired in self defense.

## CLAIMS

Petitioner seeks relief on the following grounds: 1) he was not given *Miranda* warnings before he gave his statement to the police; 2) violation of due process right to timely preliminary hearing; 3) ineffective assistance of counsel, in that his attorney did not move to suppress his statement on *Miranda* grounds, did not have sufficient time to prepare for trial, did not properly investigate, failed to object to allegedly improper expert evidence by a police officer; and 4) the state court's allowance of testimony from two prosecution witnesses whom the defense interviewed on the day of trial; and 5) that the jury pool was contaminated by pre-trial publicity.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") establishes the requirements for granting a writ of habeas corpus:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim --
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).   Subsection (d)(1) governs claims of legal error while subsection (d)(2) governs claims of factual error. See *Maynard v. Boone*, 468 F.3d 665 (10th Cir. 2006).

A. Section 2254(d)(1)

    1. Clearly established law

The AEDPA "requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 380, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).   Whether the law is clearly

established is the threshold question under § 2254(d)(1).  Id. at 390; see also *Yarborough v. Alvarado*, 541 U.S. 652, 660, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004) (the analysis "begin[s] by determining the relevant clearly established law").  Clearly established law is determined by the United States Supreme Court, and refers to the Court's "holdings, as opposed to the dicta." *Lockyer v. Andrade*, 538 U.S. 63, 71, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003) (internal quotation marks omitted) (quoting *Williams*, 529 U.S. at 412). The law is not clearly established if it announces "[a] rule that 'breaks new ground or imposes a new obligation on the States of the Federal Government.'" *Williams* at 381 (quoting *Teague v. Lane*, 489 U.S. 288, 301, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989)).  Supreme Court holdings -- the exclusive touchstone for clearly established federal law -- must be construed narrowly and consist only of something akin to on-point holdings, i.e., with facts that are at least closely-related or similar to the case sub judice.  *Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006).  See also *Rodriguez v. Miller*, 499 F.3d 136, 140 (2d Cir. 2007), ("[*Musladin*] admonishe[d] courts to read the Supreme Court's holdings narrowly and to disregard as dicta . . . much of the underlying logic and rationale of the high court's decisions."), *cert. denied*, 170 L. Ed. 2d 362 (U.S. 2008).

Without clearly established federal law, a federal habeas court need not consider whether a state court's decision was "contrary to" or involved an "unreasonable application" of such law. The threshold determination that there is no clearly established federal law is analytically dispositive in the § 2254(d)(1) analysis.  *House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008).

2. Contrary to or unreasonable application of clearly established federal law

If the threshold question as to the existence of clearly established federal law is answered affirmatively, the Court must then consider whether the state court decision is either contrary to or an unreasonable application of such law.  A state-court decision is contrary to clearly established

5

federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard*, 468 F.3d at 669 (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405). "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Williams*, 529 U.S. at 405 (citation omitted).

## ANALYSIS

As an initial matter, on its face this *pro se* petition presents issues that fall under 28 U.S.C. § 2254(d)(1), i.e., claims of legal error versus claims of factual error under 28 U.S.C. § 2254(d)(2). However, the Court notes that the Petitioner has devoted significant time and effort to addressing the issue of what he was hit with to cause the injury to his left eye. In view of the fact that *pro se* pleadings should be read liberally, the Court will briefly address the significance of whether he was or was not hit with a beer can by Luther Wheylan. Petitioner appears to be of the opinion that the killing of Mr. Montano and the shooting of Mr. Wheylan was, or should have been, justified by the fact that he was hit in the left eye with a beer can. The Court rejects this position. There was no testimony at trial that either victim was shot while striking, or attempting to strike, Petitioner with a beer can, fist, or any other object.

To the contrary, Petitioner testified that he pulled his gun when he saw Mr. Silva pinned on the ground by Mr. Wheylan, while Mr. Montano appeared poised to stab Mr. Silva with an object that looked like a knife or a screwdriver. Petitioner testified that he saw this while he was being struck from behind and the side by two or three unknown persons. He further testified that he was struck on the back of the head causing him to stagger towards Mr. Montano, whereupon Mr.

Montano turned towards Petitioner and swung at him with the knife/screwdriver. Petitioner testified that he feared for his life if he was stabbed with the knife/screwdriver, and shot Mr. Montano in self-defense.

There was substantial evidence that contradicted Petitioner's version of events. Instead of remaining at the scene until the police arrived, he fled the scene, concealed the weapon, and at first denied that he had anything to do with the shooting. There was evidence that he attempted to support this denial by concocting a story with his girlfriend to the effect that he had received the injury to his left eye the night before the shooting. No weapon or sharp object was found at the scene. No other witness testified that Mr. Montano had a knife or screwdriver. Other witnesses testified that Mr. Wheylan was some distance from Mr. Montano and Petitioner when he was shot. No other witness testified that two or three unknown persons were at the scene of the fight, let alone that Petitioner was attacked from behind by them.

While Petitioner claimed that he was minding his own business when he was struck in the eye, there was contrary evidence that Mr. Silva and Mr. Montano started fighting, Petitioner joined in with Mr. Silva against Mr. Montano, and then Mr. Wheylan joined the fray alongside Mr. Montano. In short, there was more than sufficient evidence for a jury to conclude that Petitioner had been struck hard in the left eye with something, either a fist or a beer can, but to reject Petitioner's story that he had shot Mr. Montano because it appeared that Mr. Montano was about to stab him. There was substantial evidence to support the prosecution's argument that Petitioner joined the fight, got the worst of it when he was struck in the eye, got mad, and started shooting. The Court finds that the jury verdict was not an unreasonable determination of the facts in light of the evidence presented at trial.

### A. Ineffective Assistance of Counsel

Several of Petitioner's allegations are correctly styled as an ineffective assistance of counsel claim. There is clearly established federal law regarding ineffective assistance of counsel claims. The merits of an ineffective counsel claim are squarely governed by *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In *Strickland*, 466 U.S. at 686-87, the Supreme Court devised a two-step inquiry to determine whether a lawyer's poor performance deprived an accused of his Sixth Amendment right to assistance of counsel. In order to establish an ineffective assistance claim, the petitioner must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced [his] defense." *Foster v. Ward*, 182 F.3d 1177, 1184 (10th Cir. 1999), cert. denied, 529 U.S. 1027 (2000). To establish deficient performance, Hinzo must show that his attorney made "errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment," *Williams v. Taylor*, 529 U.S. 362, 390, 146 L. Ed. 2d 389, 120 S. Ct. 1495 (2000), quoting *Strickland*, 466 U.S. at 687; and that his legal "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To establish prejudice, Hinzo "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

The prejudice component focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Williams*, 529 U.S. at 393, FN17, citing *Strickland* 466 U.S. at 687, and *Kimmelman v. Morrison*, 477 U.S. 365, 374, 393, 91 L. Ed. 2d 305, 106 S. Ct. 2574 (1986); see also *Lockhart v. Fretwell*, 506 U.S. 364, 369, 122 L. Ed. 2d 180, 113 S. Ct. 838 (1993). It is entirely appropriate for a habeas court to analyze the prejudice prong first and exclusively, if that is the easier course. *E.g. Scoggin v. Kaiser*, 186 F.3d

1203, 1207 (10th Cir. 1999).

The state court rejected Petitioner's claim that he received ineffective assistance of counsel. This Court must evaluate whether, by so doing, the state (1) acted contrary to or (2) unreasonably applied this clearly established federal law.

**1. Petitioner's Miranda claim.**

Petitioner claims his counsel was ineffective in failing to move to strike Petitioner's statement to the police on the ground that he was not read his *Miranda* warnings before giving the statement. The Court notes that there is no evidence to support Petitioner's contention that he was not given his *Miranda* warnings, although the transcript of Petitioner's recorded statement does not include the warnings. Detective Edgar Rosa testified that the taped statement was taken pursuant to Miranda rights. Tr. Vol. II p. 44. No objection was raised at the time, and Petitioner made no claim during his testimony that he had not been read his Miranda rights. Nor did Petitioner's appellate counsel raise the issue on appeal. Petitioner first raised the issue in his state habeas petition.

Petitioner's recorded statement to the police was not substantially different than his testimony at trial. It was not inculpatory, it presented Petitioner's self defense theory, i.e., that Mr. Montano lunged at him with a knife or other object during a fight, and that Petitioner was being attacked by numerous unknown persons. No other witness was available to testify that Mr. Montano lunged at Petitioner with what appeared to be a weapon. Had the statement been suppressed, and had Petitioner not testified at trial, the only evidence before the jury would have been that Petitioner shot Mr. Montano and Mr. Wheylan during a fist fight. The Court can identify no prejudice to Petitioner in the admission of the recorded statement. There is no evidence that a motion to suppress, had it been made, would have been granted.

### 2. Failure to Properly Deal with Ballistic/Weapon Evidence.

Petitioner alleges that he received ineffective assistance of counsel in that his attorney did not object to certain testimony from police officers as to the location and size of shell casings at the crime scene, the location of a bullet at the crime scene, the lack of ballistic testing to match the shell casings found at the scene to the pistol found at Petitioner's house, or the lack of DNA testing for blood on the recovered bullet. (Generally, see testimony of Kevin Renn and David Cortez.) Petitioner's objections are not well taken. Petitioner admitted that he shot Mr. Montano. (Tr. Vol. II p. 109) At trial, he identified the gun as the one he used to shoot the victims (Tr. Vol. II p. 109-110), and offered his version of why he fired. (Tr. Vol. II p. 109) Given this admission and Petitioner's self defense theory, the investigating officers' testimony regarding the caliber of the shell casings and where the shell casings were found at the crime scene was not particularly probative, nor was it prejudicial to Petitioner's defense. Nor was the lack of ballistic evidence, i.e., matching shell casings to the weapon, prejudicial to Petitioner's defense. Petitioner admitted to shooting the victims. His argument on this ground is not well taken.

### 3. Failure to Locate Marie Montano For Trial

Petitioner alleges that he received ineffective assistance of counsel because his attorney did not locate Marie Montano, Dino Montano's sister, in order to have her testify at trial. Petitioner alleges that this was prejudicial because Ms. Montano told the police during the initial investigation that she saw Luther Wheylan hit Petitioner in the head with a beer can. The absence of additional testimony regarding the alleged assault with a beer can was not prejudicial to Petitioner's defense because there was abundant other evidence of the assault. A photograph of Petitioner with a black eye (Defense Exhibit A), taken several hours after the incident, was discussed with a witness (Tr. Vol. II p.10) and admitted as evidence. The police officers who dealt with Petitioner after the

shooting described his black eye. (Tr. Vol. II p. 13) Petitioner's girlfriend described his black eye. (Tr. Vol. II p. 20-21)

The rest of Ms. Montano's statement to the police was decidedly unhelpful to Petitioner, in that she did not state that her brother was holding any sort of weapon[3], and she stated that she heard Mr. Silva asking Petitioner "Why did you do that?" after the shooting. Petitioner has presented no evidence to suggest that Ms. Montano would have testified that her brother was threatening Mr. Silva, or advancing towards Petitioner with a knife or screwdriver at the time he was shot.

Finally, the aggravated assault charge against Petitioner was based on Ms. Montano's claim that Petitioner pointed the gun at her after shooting Mr. Montano and Mr. Wheylan. This charge was dropped when Ms. Montano did not appear to testify. There were several sound tactical reasons why defense counsel would not have wanted Ms. Montano to testify, any one of which would have outweighed the value of her testimony regarding a beer can. The Court finds no prejudice in Ms. Montano's failure to testify at trial.

**4. Detective Mark Myers' Testimony Regarding Out of Court Statements by Julie Perez regarding Petitioner's Eye Injury.**

The basis for the objection is not entirely clear to the Court, but Petitioner alleges ineffective assistance of counsel in connection with the testimony of Detective Mark Myers and Julie Perez regarding the timing of Petitioner's eye injury. The prosecution called Julie Perez, Petitioner's girlfriend, who testified at trial that Petitioner had left her house early on the morning of November 23, 2002, the date of the shooting. (Tr. Vol. II p. 18-19) She further testified that he returned with a black eye and a cut below the eye. (Tr. Vol. II p. 19-20) She specifically denied participating in

---

[3]Ms. Montano was not asked at the time whether her brother was holding a weapon, but it appears to the Court that her answer would have been that he was not.

an interview, telephonic or otherwise, with any representative of the police department. (Tr. Vol. II p. 20) She denied telling any police officer that Petitioner had gotten a black eye at her house, in her presence, the day before the shooting. Id.

Detective Mark Myers was then called to the stand by the prosecution, and over the objection of the defense attorney testified that he conducted a telephone interview of Julie Perez shortly after the shooting. Detective Myers testified that Julie Perez told him that Petitioner had gotten his black eye the day before, at her residence, and that she'd seen it happen. (Vol. II Tr. 31)

At the onset of Detective Myers' testimony, defense counsel objected on the grounds that the detective's testimony would be hearsay, and that it would violate Petitioner's right to confrontation under the Sixth Amendment, citing *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). (Vol. II Tr. 27) The testimony was allowed, although the basis for allowing it is not exactly clear from the transcript. (Vol. II Tr. 28-30)

*Crawford's* holding was that a testimonial statement of a witness absent from trial is admissible only where the defendant had a prior opportunity to cross-examine the witness. Since Julie Perez *was* present for trial, testified about her statements to the police, and was cross examined in court about those statements, defense counsel's *Crawford* objection was properly overruled. Furthermore, although Detective Myers' testimony was referred to as "hearsay," that does not appear to be the case. Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801. The out of court statement of Julie Perez was not offered to prove that Petitioner had received his black eye the day before, at Julie Perez' residence, in her presence. The evidence was offered, in conjunction with the similar statements made by Petitioner to the police officer who drove him to the station, to prove that Petitioner and his girlfriend had initially conspired to conceal Petitioner's

12

involvement in the fight and subsequent shooting.

The testimony of Detective Myers' regarding what Julie Perez told him over the phone was admissible and does not reflect ineffective assistance of counsel on the part of Petitioner's defense attorney.

## 5. Defense Counsel's Alleged Failure to Prepare for Trial and Failure to Interview Mr. Wheylan or Ms. Matos Before the Day of Trial

Plaintiff alleges that his defense counsel was unprepared in that he only had three and a half months to prepare for trial. This allegation is not well taken. The Court has reviewed the entire transcript and sees no evidence of lack of preparation on the part of defense counsel. Petitioner has not carried his burden of proving that his counsel's performance was deficient. Petitioner argues that the court erroneously allowed Ms. Mata to testify[4] even though she had not been made available for pretrial interviews with defense counsel. As an initial matter, the Court has construed Petitioner's argument as one implicating ineffective assistance of counsel–failure to investigate– and a confrontation clause issue. This issue was raised by defense counsel via motion in limine. (Vol. I Tr. 5-10)  It is apparent from the transcript that neither witness was particularly cooperative, and as noted above, Ms. Montano did not even appear to testify at the trial of the man who shot and killed her brother despite the fact that she was subpoenaed by the prosecution. Both witnesses had been interviewed by the police at the time of the incident, and the interviews had been provided to defense counsel. Additionally, the court allowed time for defense counsel to meet with Ms. Mata before she testified.

Ms. Mata's trial testimony (Tr. Vol. I p. 35-66) can be fairly summarized as follows: "It was

---

[4]Defense counsel's motion in limine was directed to Ms. Mata and Maria Montano, who were subpoenaed to testify at trial. As noted in an earlier section, Ms. Montano did not appear to testify, rendering the motion in limine moot.

13

dark, it happened very quickly, and I did not see anything." She testified on direct that she did not see Mr. Montano with a knife or weapon, (Vol. I Tr. 60) but admitted on cross examination that she did not know whether there was a knife or screwdriver involved. (Vol. I Tr. 65) Petitioner does not identify anything that Ms. Mata said that was harmful to his defense, and that could have been defused if his counsel had met with her earlier than the day of trial. Nor does he identify anything helpful that she did not say, but could have testified to had she been interviewed earlier. Accordingly, the Court can identify no prejudice to defendant arising from the lack of an earlier interview. The manner in which Ms. Mata's appearance at trial was handled did not deprive Petitioner of any fundamental right guaranteed by the Constitution. *Brinlee v. Crisp*, 608 F. 2d 839, 843 (10th Cir. 1979) Accordingly, Petitioner's argument is not well taken.

### B. Alleged Procedural Defects in Grand Jury Indictment

Petitioner next alleges that he was deprived of his due process rights to a preliminary hearing. It appears that Petitioner was arrested and held on an open charge of murder. The New Mexico Rules of Criminal Procedure provide that a defendant so held is entitled to a preliminary hearing within ten days if there is not a grand jury indictment within those ten days. According to Plaintiff, he appeared in Magistrate Court on November 25, 2002, and was not indicted by a grand jury until December 6, 2002, eleven-days later. However, it is apparent to the Court that this procedural argument of whether the indictment occurred ten or eleven days after arraignment does not raise an issue whether Petitioner was deprived of any fundamental right guaranteed by the Constitution, *Brinlee v. Crisp*, 608 F. 2d 839, 843 (10th Cir. 1979), or implicate clearly established federal law, and therefore is inappropriate for federal review under the AEDPA. Accordingly, Petitioner's argument is not well taken.

### C. Alleged Contamination of the Jury Pool by Pre-Trial Publicity

Finally, Petitioner alleges that the jury pool was tainted by a newspaper article that appeared in the local paper either on the day of trial or a day before trial. Petitioner does not appear to have raised this argument in the State proceedings, nor did he include it in his original federal petition. Instead, he included it in a subsequent submission to the Court, and it has not been responded to by Respondent. In a habeas corpus proceeding, where a state does not raise a procedural bar to a claim, a federal court may consider the claim on the merits. *Hale v. Gibson*, 227 F.3d 1298, 2000 U.S. App. LEXIS 23727 (10th Cir. 2000).

The newspaper article in question described the charges against Petitioner: second degree murder, aggravated battery and aggravated assault; and the fact that Petitioner alleged that he shot in self-defense. The article noted that Petitioner had been acquitted in February 2000 of murder charges in the stabbing death of Michael Estrada, and that Petitioner had admitted stabbing Estrada but said he acted in self-defense. The article recounted that the newspaper had published a letter from Petitioner three weeks after the shooting in which he wrote that he "never meant to take Dean's life. It was a horrible accident that never should have happened." The article described Petitioner's criminal record, and noted that he faced 22 ½ years in prison based on the charges, but that he could receive more time as an habitual offender.

During jury selection the trial judge asked the jury panel whether any of them had read anything in the paper about the case. Six prospective jurors (Seats 2, 3, 7, 14, 44, and 61) said they had seen and read the article. One juror (Seat 41) said he had seen the article but did not read it because he thought he might be a juror on the case. Each of the jurors who had read the article were asked by the judge whether they could set aside that information, listen only to the evidence at trial, and reach a verdict based on the admitted evidence alone. Five jurors said that they could. One

15

juror (Seat 44) was excused after advising the Court that she thought the article might improperly influence her[5].

Of the remaining five jurors who had read the article, one juror (Seat 2) was struck for cause on motion by the defense. That juror had described an incident in Mexico City where his niece was killed at a family gathering, apparently in his presence, and was highly equivocal whether he'd be able to judge the instant case fairly. Defense counsel stated that the juror in Seat 3 was "fine." Defense counsel struck the juror in Seat 7 with a peremptory challenge, with no explanation. The judge questioned the suitablility of the juror in Seat 14 based on the fact that he was a bus driver who had a trip scheduled the next day. Neither attorney was inclined dismiss the juror, and defense counsel stated that "he is fine." The last of the five jurors (Seat 61) was not reached. Accordingly, the jury that heard the case included two jurors (Seats 3 and 14) that had read the article in question, and who had advised the Court that they would not let it influence their deliberations, and who had not been challenged by defense counsel either for cause or peremptorily. The Court also notes that of the ten questions asked by the jury during the course of the trial, two were asked by the juror from Seat 3. (P. 205-211, Record Proper) None of the questions asked by the jury related to information in the newspaper article.

The right to trial by impartial jury is fundamental concept of due process. U.S.C.A. Const. Amends. 5, 14. *Burton v. Johnson*, 948 F.2d 1150 (10th Cir. 1991). It is the responsibility of the trial court to guarantee that the jury is fair and impartial. *United States v. Gillis*, 942 F.2d 707, 709 (10th Cir. 1991) (cit. omitted). However, the trial court retains great latitude in its oversight of voir dire. *Morgan v. Illinois*, 112 S.Ct. 2222, 2229-30 (1992); *State v. Trujillo*, 99 N.M. 251, 252 (1982).

---

[5]The juror in Seat 44 had numerous reasons why she believed she should be excused from jury duty, the newspaper article was one of them.

Federal law regarding trial by an impartial jury is "clearly established," so this matter is appropriate for consideration in a federal habeas petition pursuant to the AEDPA. Additionally, since Petitioner's counsel made no motion for change of venue, and did not attempt to strike jurors who had read the newspaper article, this issue involves effective assistance of counsel, also a clearly established area of federal law.

First, defense counsel did not file a motion for change of venue, but it is clear to the Court that Petitioner sustained no prejudice as a result, as such a motion would not have been granted. To have a change of venue motion granted based on pre-trial publicity, the defendant must demonstrate either that the publicity would result in actual prejudice at trial or that the publicity would give rise to a presumption of prejudice because it involves "such a probability that prejudice will result that it is deemed inherently lacking in due process." *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961); *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975).

The defendant bears the burden of establishing that prejudice should be presumed. See *Stafford v. Saffle*, 34 F.3d 1557, 1566 (10th Cir. 1994). In order to demonstrate that prejudice should be presumed, the defendant must "establish that an irrepressibly hostile attitude pervaded the community." *Id.* at 1567. "Simply showing that all the potential jurors knew about the case and that there was extensive pretrial publicity will not suffice to demonstrate that an irrepressibly hostile attitude pervaded the community." *Id.* at 1566. The level of pre-trial publicity in this case was low, and significantly lower than that in *Hale v. Gibson*, 227 F.3d 1298 (10th Cir. 2000) where the petitioner was found not to have established a presumption of prejudice. The Court sees no basis for a finding of presumed prejudice.

Nor is there a basis for a finding of actual prejudice. In this instance there was not "extensive" pretrial publicity, just one article which was read by six out of several dozen potential

17

jurors. A jury's exposure to a "defendant's prior convictions or to news accounts of the crime with which he is charged" cannot alone demonstrate that the defendant was denied due process. *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975). Only two members of the jury had read the newspaper article in question. Both were asked by the judge whether they could set aside the information in the article and render a verdict based solely on the evidence in court. Both stated unequivocally that they could. It is a basic tenet of jurisprudence that we presume that jurors follow the law, including the trial court's instructions. *United States v. Coleman*, 7 F.3d 1500, 1506 (10th Cir. 1993); *United States v. Hollis*, 971 F.2d 1441, 1455 (10th Cir.1992), *cert. denied*, 507 U.S. 985 (1993).

In comparison, the Supreme Court found actual prejudice in *Irvin v. Dowd*. In that case, over ninety percent of the 430 prospective jurors interviewed entertained some opinion as to guilt, 268 were dismissed for cause, and eight out of the twelve jurors actually seated stated they believed the defendant was guilty. *Irvin*, 366 U.S. at 727. Petitioner's claim that he was denied due process as a result of pre-trial publicity is not well taken.

Finally, the Court addresses whether the Petitioner was denied effective assistance of counsel by his attorney's failure to strike, for cause or by peremptory challenge, the two jurors who had read the newspaper article. Counsel's performance is deficient if the representation "falls below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 690 (1984); *see also United States v. Rivera*, 900 F.2d 1462, 1472 (10th Cir. 1990). Because there is a strong presumption that counsel acted reasonably and represented his client effectively, the Court reviews counsel's performance with substantial deference. *Davis v. Exec. Dir. of Dep't of Corrections*, 100 F.3d 750, 759 (10th Cir. 1996). Strategic or tactical decisions on the part of counsel are presumed correct, *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, unless they were "completely unreasonable, not

18

merely wrong, so that [they] bear no relationship to a possible defense strategy," *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir.2000).

The Court notes again the fact that both jurors assured the trial court that they would judge the case based solely on the testimony they heard in the courtroom.  It is possible that there were other tactical reasons for defense counsel to want to keep these two individuals on the jury.  The Court cannot say that the decision not to strike the two individuals was "completely unreasonable." Furthermore, there is no evidence in the record proper that the two jurors failed to live up to their promise to listen only to the evidence presented at trial.  The jury as a whole submitted ten questions to the trial judge, and each of the questions addressed a substantive issue arising from the testimony of the witness who was testifying at the time.  There is no basis for the Court to conclude that there is a reasonable probability that, but for the two jurors who had read the newspaper article, a guilty verdict would not have been returned.

## RECOMMENDED DISPOSITION

An evidentiary hearing is not required on issues that can be resolved by reference to the state court record.  Totten v. Merckle, 137 F.3d 1172 (9th Cir. 1998) The Court is satisfied that an evidentiary hearing is not necessary in this case.  The Court recommends that Justin James Hinzo's Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 be DISMISSED with prejudice.

_____
W. Daniel Schneider
United States Magistrate Judge